UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


BASF CORPORATION,
    Plaintiff,


        v.                          CIVIL ACTION NO.
                                    10-11160-MBB

SUBLIME RESTORATIONS, INC. and
JULIAN JOHN MILLER,
    Defendants.



**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 19);**
**PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S PROPOSED EXPERT**
**TESTIMONY**
**(DOCKET ENTRY # 23)**



**July 26, 2012**


**BOWLER, U.S.M.J**

        Pending before this court is a motion for summary judgment

pursuant to Rule 56, Fed. R. Civ. P. ("Rule 56"), filed by

plaintiff BASF Corporation ("plaintiff").  (Docket Entry # 19).

Also pending is plaintiff's motion to strike the proposed expert

testimony of defendant Julian John Miller ("Miller").  Miller and

defendant Sublime Restorations, Inc. ("Sublime") (collectively

"defendants") oppose both motions.  (Docket Entry ## 21 & 26).

On March 22, 2012, this court held a hearing and took the summary judgment motion (Docket Entry # 19) under advisement.  At the hearing, this court advised the parties it would take the motion to strike (Docket Entry # 23) on the papers once fully briefed.

PROCEDURAL BACKGROUND

The complaint filed against defendants contains six claims.  (Docket Entry # 1).  Counts one and two assert breach of contract claims against Sublime and Miller, respectively.  Counts three and four assert unjust enrichment claims against Sublime and Miller, respectively.  Count Five asserts a claim of money had and received against defendants and Count Six asserts a claim of breach of the implied covenant of good faith and fair dealing against defendants.

Although plaintiff "moves for summary judgment on its complaint against the defendant Sublime Restoration, Inc." (Docket Entry # 19), the memorandum only addresses the breach of contract claim and seeks summary judgment against Sublime.[1]  (Docket Entry # 19, pp. 1 & 8).  Given the lack of argument or mention of the unjust enrichment, money had and received and the breach of the implied covenant of good faith claims, the motion is confined to the breach of contract claim against Sublime.  See L.R. 7.1(b)(1); Higgins v. New Balance Athletic Shoe, Inc., 194

---

[1]  Sublime and Miller filed the opposition.  (Docket Entry # 21).

2

F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see also United States v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009), cert. denied, 130 S.Ct. 2422 (2010) (before "district court, Dyer never used the term 'specific intent' to set forth legal requirements for applying §2G2.4(c)(2), and has waived the argument").

Defendants first identified Miller as a fact witness in their initial disclosure on December 30, 2010. (Docket Entry # 15). Defendants stated that they did not "anticipate retaining an expert at [that] time, but reserve[d] their right to do so, and [would] notify plaintiff prior to trial." (Docket Entry # 15). When asked in plaintiff's interrogatory to identify all persons whom defendants expected to call at trial as expert witnesses, defendants' May 11, 2011 response was "None at this time." (Docket Entry # 19-5).

At a scheduling conference on January 3, 2011, this court set a discovery schedule in accordance with Rule 16(b), Fed. R. Civ. P. (Docket Entry # 16). Therein, this court established the following deadlines: (1) amendments to the pleadings by July 15, 2011; (2) service of written discovery requests by March 31, 2011; (3) close of fact discovery by June 30, 2011; (4) designation of expert witnesses by August 15, 2011; (5) close of expert discovery by September 15, 2011; and (6) deadline for

3

filing dispositive motions by September 30, 2011.  (Docket Entry # 16).

On July 25, 2011, this court allowed the parties' motion to amend the scheduling order so that defendants could produce additional documents referenced during Miller's first deposition on July 21, 2011, and to allow plaintiff an additional opportunity to depose Miller regarding certain supplementary documents.  This court established the following modified deadlines:  (1) close of fact discovery by September 15, 2011; (2) designation of expert witnesses by October 15, 2011; (3) close of expert discovery by November 15, 2011; and (4) deadline for filing dispositive motions by November 30, 2011.  (Docket Entry # 17).  At a November 9, 2011 status conference, this court extended the deadline for filing dispositive motions to December 29, 2011.

On December 28, 2011, plaintiff filed the summary judgment motion.  (Docket Entry # 19).  Defendants acknowledge that it was not until January 31, 2012, after the close of expert discovery and as part of their opposition to plaintiff's summary judgment motion (Docket Entry # 21) that defendants designated Miller as an expert to testify about his "observations, experience, and conclusions concerning the [plaintiff's] paint products which are at issue in this case."  (Docket Entry # 26-1).

On March 22, 2012, defendants supplemented the

4

aforementioned expert interrogatory detailing Miller's background.  (Docket Entry # 26-1).  Miller has worked in the automobile restoration industry for over 25 years, obtained certification through plaintiff as a certified painter in 1994 and has worked extensively with plaintiff's paints.  (Docket Entry # 26-1).  In 2006, Harvard scientists recruited Miller to recreate and match the paint in a piece of artwork.  Two publications then credited him as an author regarding the work. (Docket Entry # 26-1).

As a remedy for defendants' disregard of their obligation to designate Miller as an expert witness by the court ordered deadline, plaintiff moves to strike Miller's proposed expert testimony.  (Docket Entry # 25).  Plaintiff also argues that Miller is not qualified as an expert because he offers no reliable methodology or technique to test the allegedly defective products.  (Docket Entry # 25).

I.   <u>MOTION TO STRIKE (DOCKET ENTRY # 23)</u>

A.   <u>Untimeliness</u>

Plaintiff argues that defendants' untimely disclosure of Miller as an expert requires precluding his expert opinion testimony at trial.  Defendants did not designate Miller as an expert nor did they provide Rule 26(a), Fed. R. Civ. P. ("Rule 26(a)"), expert disclosures prior to the October 15, 2011 deadline.  (Docket Entry # 17).  Defendants did not anticipate

retaining an expert in their initial disclosure but identified Miller as a fact witness for trial.  (Docket Entry # 15).  When asked in plaintiff's first set of interrogatories to identify all persons defendants expected to call at trial as expert witnesses, defendants responded, "None at this time."  (Docket Entry # 19-5).  In fact, defendants only designated Miller as an expert after plaintiff asserted in its summary judgment motion that defendants could not prove the defectiveness of plaintiff's paint equipment and products without expert testimony.

"Rule 37(c)(1), Fed. R. Civ. P. ("Rule 37(c)(1)"), provides a self executing sanction which enforces the disclosures required under Rule 26(a)(2)."  Acadia Ins. Co. v. Cunningham, 771 F.Supp.2d 172, 175 (D.Mass. 2011); see Poulis-Minott v. Smith, 388 F.3d 354, 358 (1st Cir. 2004).  "Unless the failure to disclose is substantially justified or harmless, the failure to disclose triggers the imposition of sanctions under Rule 37(c)(1)."  Coons v. A.F. Chapman Corp., 2007 WL 4707653, at *3 (D.Mass. April 25, 2007), aff'd, 620 F.3d 38 (1st Cir. 2010); Rule 37(c)(1), Fed. R. Civ. P.; see Pena-Crespo v. Commonwealth of Puerto Rico, 408 F.3d 10, 13 (1st Cir. 2005).

"A substantial justification is one that could satisfy a reasonable person, not a justification of a high degree." Charter Envtl., Inc. v. Shaw Envtl., Inc., 2009 WL 2982772, at *15 (D.Mass. Sept. 14, 2009) (internal quotations omitted).  In

opposition to plaintiff's motion to strike, defendants offer no substantial justification for the untimely designation of Miller as an expert.  See Macaulay v. Anas, 321 F.3d 45, 52 (1st Cir. 2003) (district court's preclusion of expert evidence appropriate where no real justification for untimely submission advanced). Defendants only offer as justification their belief that no expert evidence is necessary to support their asserted defense.

Defendants also assert that their late designation of Miller as an expert in no way prejudiced plaintiff, in other words, that the late designation was harmless.  The Advisory Committee Notes to the 1993 Amendments to Rule 37(c) "suggest a fairly limited concept of 'harmless.'"  Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir. 2006).  Because defendants listed Miller as a fact witness for trial as part of their initial disclosure on December 30, 2010 (Docket Entry # 15) the circumstances in the case at bar "fall squarely within the reach of at least one of the illustrative examples, to wit, 'a potential witness known to all parties.'"  Acadia Ins. Co. v. Cunningham, 771 F.Supp.2d 172, 177 (D.Mass. 2011); accord Gagnon, 437 F.3d at 197 (listing examples of harmlessness including "late disclosures of a potential witness known to all parties" and "a trial witness already listed by the adverse party").

While defendants failed to identify Miller as an expert until their response to plaintiff's summary judgment motion,

plaintiff had the opportunity to depose Miller once on July 21, 2011, and again on November 9, 2011, as represented by defendants.  (Docket Entry # 26).  During the July 21, 2011 deposition, plaintiff questioned Miller's qualifications (Docket Entry # 19-2, pp. 16-20) as well as the methodology and techniques used to determine that the mixed paint did not match the samples.  (Docket Entry # 19-2, pp. 84-88).  As a result, plaintiff's approach to the deposition would likely have been no different had Miller been designated as an expert from the beginning.  Accordingly, it can claim little prejudice as a result of the late designation.

Conversely, plaintiff has already incurred the cost of drafting and submitting a summary judgment motion based on the understanding that defendant was proceeding to trial without any expert witness.  With no scheduled trial date, however, plaintiff could circumvent any unfair advantage gained by defendants as a result of their late designation by submitting an amended summary judgment motion and/or requesting from this court an additional opportunity to depose Miller.  See Acadia Ins. Co. v. Cunningham, 771 F.Supp.2d at 177.

"As recently noted by the First Circuit, '[T]he procedural rule itself makes clear [that] in the absence of harm to a party, a district court may not invoke the severe exclusionary penalty provided for by Rule 37(c)(1).'"  Acadia Ins. Co., 771 F.Supp.2d

at 175 (quoting <u>Cruz-Vazquez v. Mennonite General Hosp., Inc.</u>, 613 F.3d 54, 58 n.1 (1st Cir. 2010)).  Accordingly, defendants' untimely expert designation does not, on its own, merit the severe sanction of exclusion.

"In addition to or *in lieu of* [the preclusion] sanction, the court . . . may impose other appropriate sanctions."  Rule 37(c)(1), Fed. R. Civ. P. (emphasis added).  In this case, a more moderate sanction of fees and expenses is appropriate.  <u>See</u>, <u>e.g.</u>, <u>Coons v. A.F. Chapman Corp.</u>, 2007 WL 4707653 at *6 (D.Mass. April 25, 2007), <u>aff'd</u>, 620 F.3d 38 (1st Cir. 2010).  As a sanction for defendants' untimely expert designation and after the conclusion of trial or other disposition in this action, plaintiff may, pursuant to Rule 37(c)(1), submit a request for costs and expenses, including attorney's fees, relating to preparing and arguing its motion to strike.

B.  <u>Qualification</u>

Next, plaintiff argues that Miller lacks the qualifications to testify as an expert witness.  The Federal Rules of Evidence provide that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliance principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702, Fed. R. Evid. 702 ("Rule 702").  Daubert requires a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  The trial judge serves as a "gatekeeper," applying Daubert to not only "scientific" but all expert testimony as defined by Rule 702.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

"In performing its gatekeeping function in assessing proffered expert evidence, a court must consider "whether the putative expert is "qualified by 'knowledge, skill, experience, training, or education.'"  Prado Alvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36, 39 (1st Cir. 2005) (citing inter alia Daubert, 509 U.S. at 592, and Rule 702).

Here, defendants proffer Miller as an expert to render an opinion that the "paint and paint mixing equipment provided by [plaintiff] failed to produce paint colors which matched the sample colors which they were supposed to match."  (Docket Entry # 21-1).  Turning to Miller's qualifications, before opening his own automobile restoration business he worked for a number of well respected employers in the industry for over 25 years.  He was certified through plaintiff as a certified painter in 1994 and worked extensively mixing and matching plaintiff's paints. In 2006, he was recruited by Harvard University to recreate and match the paint from an historic work of art and was then

credited in two publications regarding the work.  Based on his

knowledge, skill, experience and training, Miller qualifies as an

expert witness.

Turning to the reliability of the testimony, the Court in

Daubert identified the following factors for the trial court to

consider in determining the admissibility of expert testimony:

> 1) whether the expert's technique or theory can be or has
> been tested; 2) whether the expert's technique or theory has
> been subject to peer review and publication; 3) the known or
> potential error rate; 4) the existence and maintenance of
> standards and controls; and 5) whether the technique has
> gained general acceptance in the relevant scientific
> community.

United States v. Green, 405 F.Supp.2d 104, 118 (D.Mass. 2005);

see United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002).

These factors "do not constitute a 'definitive checklist or

test,'" and the question of admissibility "must be tied to the

facts of a particular case."  Kumho Tire Co., 526 U.S. at 150

(quoting Daubert, 509 U.S. at 593).  As "there are many different

kinds of experts, and many different kinds of expertise," such

factors "may or may not be pertinent in assessing reliability,

depending on the nature of the issue, the expert's particular

expertise, and the subject of his testimony."  Id.

Although Daubert urged trial courts to direct their

attention toward "'principles and methodology, not on the

conclusions that they generate,'" Daubert, 509 U.S. at 595, the

Supreme Court later clarified that such attention "'need not

completely pretermit judicial consideration of an expert's conclusions.'" Milward v. Acuity Specialty Prods. Group, 639 F.3d 11, 15 (1st Cir. 2011) (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998)), cert. denied, 132 S.Ct. 1002 (2012).  The Supreme Court in Joiner explained that, "conclusions and methodology are not entirely distinct from one another" and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Ruiz-Troche, 161 F.3d at 81; see Milward v. Acuity Specialty Prods. Group, 639 F.3d at 15.

Moreover, "Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." Ruiz-Troche, 161 F.3d at 85.  The party proffering the expert testimony must only show that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Id.; see also United States v. Vargas, 471 F.3d 255, 265 (1st Cir. 2006).  "The court's assessment of reliability is flexible, but 'an expert must vouchsafe the

reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.'"  <u>Zachar v. Lee</u>, 363 F.3d 70, 76 (1st Cir. 2004).  The Supreme Court in <u>Daubert</u> encouraged judges, so long as the expert testimony rests on valid grounds, to let the jurors assess the weight of the evidence and opinion of the expert. <u>Daubert</u>, 509 U.S. at 590.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Id.</u>; <u>see also</u> <u>Currier v. United Techs. Corp.</u>, 393 F.3d 246, 252 (1st Cir. 2004).

"The expert's 'specialized knowledge' must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  <u>Alves v. Mazda Motor of Am., Inc.</u>, 448 F.Supp.2d 285, 298 (D.Mass. 2006); Rule 702, Fed. R. Evid.  In Miller's deposition, he explained how he used plaintiff's paint equipment to match the mixed paint to the color of the automobile being painted, specifically, how he would select the closest match to the color of the automobile from a deck of samples and that the mixed paint should match the sample.  In particular, Miller explained:

> They give you color tools, which is a deck of colors.  If you drive a BMW and it's a 354 silver metallic and I look up silver metallic, it says there are three alternates.  That means there are three slightly different variations of that color.  The way paint systems are designed is that you go and get those decks.  It's an alternate deck that is

>sprayouts of that color.  You go over to the car, and you
>put them on the car.  You mix that color.  It should match
>the color.  BASF, you mix the paint, it doesn't match their
>color deck.

(Docket Entry # 19-2, pp. 44-45).  Such knowledge would be
helpful to the trier of fact in understanding the process of
matching the paint to the car and in highlighting where in the
process the failure occurred.

Miller bases his opinion that the paint product failed on
his own personal observation of the occasions where the mixed
paint did not match the color decks.  Plaintiff argues that
defendants offer no "methodology, testing, analysis or evidence
of reliability other than faith in his own eye for colors" and
that the testimony cannot be "tested or repeated because it
relies solely on [Miller]'s subjective perspective."  (Docket
Entry # 25).  While this court acknowledges defendants' counter
argument that the approach could be repeated and tested by mixing
plaintiff's paint using their equipment and comparing against its
sample color deck (Docket Entry # 26), the record lacks
sufficient evidence to support a finding that Miller employs
techniques reliable enough to render an expert opinion that the
product has failed to perform.  Miller grounds his opinion on his
own visual inspection, a method with an unknown error rate as his
technique amounts to little more than "eyeballing" the various
painted materials.  See United States v. Frabizio, 445 F.Supp.2d
152, 159 (D.Mass. 2006) (rejecting expert's methodology because

14

technique of visual observation not reliable to distinguish between real and digitally manufactured images).  Moreover, there is no recognized industry standard put forth as evidence in the record to determine how closely the mixed paint should match the color samples or whether any variation in color is to be expected or acceptable.  Defendants have not brought forth any evidence of Miller's technique gaining any acceptance within the relevant community, nor does the record show that Miller's technique has been tested to measure its reliability.

Opining that the mixed paint does not match the color samples, moreover, differs considerably from claiming that the product is defective based on the fact that the colors do not match.  For example, there is no evidence in the record that the material Miller chose for the test panels did not alter the appearance of the color of the mixed paint when applied. Although Miller is a qualified painter, defendants do not point to any evidence in the record that the color mismatch was not due to user error, i.e., varying quantities of paint applied. Plaintiff asserts that "several variables inherent in the application process, including but not limited to base weighting, base maintenance, spray application by the user, and a wide range of color variations at the OEM level, in addition to fading and weathering of the original finish, may affect results."  (Docket Entry # 19-4).  Due to the lack of non-conclusory, supporting

15

evidence in the record showing that Miller's testimony is based on any theory or test capable of being repeated, subjected to peer review, standardized in the industry, or developed through any research, Miller's testimonial opinion that the product failed on many levels is "simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. Since the "burden of proof with respect to reliability remains on the proponent of the evidence," United States v. Monteiro, 407 F.Supp.2d 351, 366 (D.Mass. 2006), this court accordingly finds that Miller should not be designated as an expert.

II.  MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 19)

STANDARD OF REVIEW

Summary judgment is designed to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Davila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007). It is "appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-

moving party.  A fact is material if it has the potential of
determining the outcome of the litigation."  Baker v. St. Paul
Travelers Ins. Co, 670 F.3d 119, 125 (1st Cir. 2012).

     The case shall be viewed "resolving all evidentiary
conflicts and drawing all reasonable inferences in favor of the
nonmoving party."  Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir.
2011).  "The nonmovant may defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that a
trialworthy issue persists."  Sánchez-Rodríguez v. AT&T Mobility
P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012).  "A conglomeration of
conclusory allegations, improbable inferences, and unsupported
speculation is insufficient to discharge the nonmovant's burden."
Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 30
(1st Cir. 2012).  "To defeat a motion for summary judgment,
evidence offered by the non-movant 'must be significantly
probative of specific facts.'"  Prescott, 538 F.3d at 40.

                        FACTUAL BACKGROUND

     On June 19, 2006, plaintiff and Sublime executed a
requirements contract ("requirements agreement") whereby Sublime
agreed to purchase the greater of (1) 100% of its requirements
for a term of five years or (2) $242,000 of plaintiff's "after-
market paints, refinishes, coatings, primers, thinners and
reducers" ("refinish products").  (Docket Entry # 19-3).  In
addition to this exclusivity provision and as part of the

requirements agreement, plaintiff agreed to loan to Sublime, for use at Sublime's automobile body restoration shop, plaintiff's equipment for use in mixing and matching paint ("loaned equipment"). (Docket Entry # 19-3). Plaintiff also agreed to provide certain products as inventory for use on a consignment basis ("consigned inventory"). (Docket Entry # 19-3).

In consideration for Sublime "fulfilling all of its obligations" under the requirements agreement, plaintiff agreed to pay Sublime $30,000. (Docket Entry # 19-3). Should the contract terminate before the end of the five year period for any reason, Sublime agreed to refund a percentage of the $30,000 payment in accordance with a sliding scale schedule included in paragraph four of the requirements agreement.[2] (Docket Entry # 19-3, ¶ 4).

---

[2] The pertinent paragraph of the requirements agreement reads as follows:

> Within 45 days of the Effective Date of this Agreement, BSM shall pay to BODY SHOP $30,000 in consideration of BODY SHOP fulfilling all of its obligations hereunder for the entire Term Should this Agreement *terminate for any reason* prior to the expiration of the Contract Term set forth above, *in addition to whatever rights and obligations the parties may have to each other*, *BODY SHOP shall refund* the percentage of the *Contract Fulfillment Consideration* in accordance with the following schedule:
>
> a. The later of 1/5th of the Min. Purchases or the end of Contract Year 1 – 110%
> b. The later of 2/5ths of the Min. Purchases or the end of Contract Year 1 – 85%
> c. The later of 3/5ths of the Min. Purchases or the end of Contract Year 1 – 60%
> d. The later of 4/5ths of the Min. Purchases or the end of

The requirements contract also contained an integration clause.  The relevant language reads as follows:

> Entire Agreement:  This Agreement constitutes the entire agreement between BSM and the BODY SHOP, terminating and superseding any prior agreements relating to the subject matter hereof and may be amended only by a writing signed by both parties, notwithstanding any course of dealing or the exchange of correspondence or documents not mutually executed.

(Docket Entry # 19-3, ¶ 10).  Notwithstanding the integration clause, Miller attests by affidavit that at the time he entered into the requirements agreement, Peter Walsh ("Walsh"), a BASF Corporation salesman, and plaintiff promised him "that the BASF paint products were a good product."  (Docket Entry 21-1).  In entering into the contract, Miller testified by deposition that he relied on Walsh's "word . . . that the product was as good as their previous line" and that the product "to be supplied . . . was a good product."  (Docket Entry # 19-2, p. 43).  By affidavit, Miller states that "he observed that products failed to perform on many levels."  (Docket Entry 21-1).  Similarly, at his deposition Miller testified that the "[p]roduct did not perform as promised on any level . . . [Miller] had massive problems as well as problems with getting problems solved."  (Docket Entry 19-2, p. 44).

---

      Contract Year 1 – 40%
      e.  The later of 5/5ths of the Min. Purchases or the end of
      Contract Year 1 – 20%.

(Docket Entry # 19-3) (emphasis added).

On June 25, 2008, Miller, president and sole shareholder of Sublime, terminated and breached the exclusivity provision of the requirements agreement with plaintiff by entering into an agreement to purchase paint supplies and refinish products from Crown Auto Body Supply, LLC instead of from plaintiff.  (Docket Entry # 19-2, pp. 35-36).  Plaintiff notified defendants in July 2008 that defendants had breached the requirements agreement and demanded the amounts due and owing under the contract.

As set forth in its April 20, 2011 answer to defendants' interrogatories, plaintiff attests that defendants owe the following amounts in damages:  (1) $69,702 for "lost profits based on the remaining balance of Sublime's minimum purchase requirements"; (2) $13,172.14 for "unpaid invoices for the purchase of refinish products as of August 26, 2008"; (3) $12,026.59 for the "value of the consigned inventory as of August 26, 2008"; and (4) $33,000 for the refundable portion of the consideration payment due according to the sliding scale schedule outlined in paragraph four of the requirements agreement.  (Docket Entry # 19-4).  As a result of defendants' failure to pay, plaintiff filed suit in July 2010.

Following the commencement of this action, in April 2011 defendants received a letter outlining a complaint from a customer about the "paint failing after it was put on the car."  (Docket Entry # 19-2, p. 73).  Miller describes one other

customer with a BMW 5 series vehicle who telephoned about the paint failing after the car left the shop, but defendants ultimately did not need to fix the paint.  (Docket Entry # 19-2, pp. 74-75).  Miller also testified that he noticed another customer's vehicle starting to delaminate that had not yet been fixed (Docket Entry # 19-2, pp. 76-77) and that after defendants ceased using plaintiff's paint products, defendants' customers whose cars were painted using plaintiff's paint products "are now finding that the paint on their cars is delaminating and/or peeling."  (Docket Entry 21-1).

DISCUSSION

A.  <u>Breach of Contract Claim</u>

Plaintiff claims that Sublime breached the requirements agreement by unilaterally terminating the agreement on June 25, 2008.  (Docket Entry # 19).  Additionally, plaintiff claims that "even to the extent that this Court determined that there was a material dispute of fact regarding the parties' dispute, the $30,000 [in consideration for the contract] should be returned immediately."  (Docket Entry # 19).  No genuine dispute exists between the parties regarding the terms of the requirements agreement, nor that the June 25, 2008 termination constituted a breach under the contract.  (Docket Entry ## 19 & 21).  Sublime, however, argues that it was justified in its breach because of the failure of the paint products to perform.  Sublime maintains

21

that plaintiff's paint and paint mixing equipment failed to
produce paints that matched the sample colors they were supposed
to match or the cars Sublime was painting.

"'[A] material breach by one party excuses the other party
from further performance under the contract,' and 'once relieved
from performance, the injured party is not liable for further
damages incurred by the party in material breach.'"  Teragram
Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006)
(internal citation omitted); accord Dialogo, LLC v. Bauza, 456
F.Supp.2d 219, 225 (D.Mass. 2006); see also Micrel, Inc. v. TRW,
Inc., 486 F.3d 866, 879 (6th Cir. 2007) (in contract for sale of
goods covered under Uniform Commercial Code, jury instructed that
"a material breach by one party excuses the other party from
performing its remaining obligations under the agreement").
Defendants thus submit that plaintiff's breach of an express
warranty and/or the implied warranty of merchantability justified
the termination of the contract.  (Docket Entry # 21).  According
to defendants, mixing and spraying multiple batches of mixed
paint for each job to test for a match, then discarding the non-
matching mixed paint as waste, significantly increased their
labor costs.  (Docket Entry # 21).  Defendants also point out
that, in addition to the paint match issues, customers whose cars
were painted with plaintiff's products "are now finding that the

paint on their cars is delaminating and/or peeling."  (Docket Entry # 21-1).

Defendants also submit that, before entering into the requirements agreement, defendants relied on the promise that the paint and paint equipment would perform "equally, if not better" than the products defendants previously used and that they "relied on the promise that [plaintiff's] paint products were a good product."  (Docket Entry # 21-1).  Defendants also point out that almost immediately after entering into the requirements agreement, Miller began to observe the color match issues and had numerous conversations with Walsh that led to neither improvement or resolution regarding such issues.  (Docket Entry # 21).  Miller attests that he "had numerous conversations with [Walsh]" about the failure of the paint and the paint mixing equipment to produce colors matching the sample.  (Docket Entry # 21-1).  Miller further avers that he informed plaintiffs about the issues on multiple occasions and if plaintiff did not correct the paint match issues defendants would have no choice but to terminate the contract.

B.  Implied Warranty of Merchantability

Massachusetts' version of the Uniform Commercial Code provides that a "warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Mass. Gen. L. ch. 106, § 2-

314.  To be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used."  Mass. Gen. L. ch. 106, § 2-314(2)(c).  The level of review is not that of the subjective expectations of the particular user, but the reasonable expectations of an ordinary user or purchaser. Wasylow v. Glock, Inc., 975 F.Supp. 370 (D.Mass. 1996); see Venezia v. Miller Brewing Co., 626 F.2d 188, 190 (1st Cir. 1980) ("question of fitness for ordinary purposes is largely one centering around reasonable consumer expectations").

Initially, this court turns to whether a breach of implied warranty of merchantability claim requires expert testimony to prove a breach due to product failure.  Plaintiff argues that it requires expert testimony which, because this court struck Miller as an expert, is absent and therefore fatal to this defense.  If defendants' affirmative defense survives without expert testimony, however, this court will examine whether a genuine issue of material fact remains.

In actions based on diversity jurisdiction, state law determines whether expert testimony is necessary.  See Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 27 (1st Cir. 2006). Under Massachusetts law, product failure cases "seem more or less to fall among a broad, some might say disordered, spectrum." Bruno v. Columbia Manufacturing Company, Inc., 1996 WL 528482, at *5 (Mass.App.Div. Sept. 6, 1996).

Plaintiff asserts that expert testimony is required to prove product failure because the "answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors."  (Docket Entry # 19).  Certainly, many decisions have required expert testimony to establish a product defect.  See Madigan v. GMC, 2009 WL 77975, at *2 (Mass.App.Ct. Jan. 14, 2009) (defective deployment of an airbag beyond scope of reasonable juror's common knowledge therefore requiring expert testimony); Esturban v. Mass. Bay Transp. Auth., 865 N.E.2d 834, 835-36 (Mass.App.Ct. 2007) (dimensions essential to safe operation of escalator beyond scope of a juror's common knowledge therefore requiring expert testimony).

The particular circumstances and the ultimate question of this case (whether plaintiff's paint and paint equipment produced mixed paint that matched the samples), however, fall within the common knowledge of a reasonable juror and thus can be decided without the opinion of a designated expert.  See Smith v. Ariens Co., 377 N.E.2d 954, 957-58 (Mass. 1978) (jury could determine whether unshielded metal protrusions on the handle bar of a snowmobile constitutes a design defect with an unreasonable risk of harm); doCanto v. Ametek, Inc., 328 N.E.2d 873, 877 (Mass. 1975) (jury could determine based on its lay knowledge whether failure to immediately stop was design defect in commercial ironing machine); Richard v. Amer. Manufacturing Co., Inc., 489

N.E.2d 214, 215 (Mass.App.Ct. 1986) (bag bundling press manufacturer liable without need for expert testimony); see also United States v. Yuot, 2008 WL 2857144, at *4 (N.D.Iowa July 23, 2008) (no expert designation required to submit inference that two socks matched where color was a main component of the determination).

In addition, a genuine dispute of material fact remains as to whether the "paint and paint mixing equipment provided by [plaintiff] failed to produce paint colors which matched the sample colors which they were supposed to match." (Docket Entry # 21-1). Miller's lay testimony, based on his personal experience, including the description of the process of his paint selection, mixing and application, however, will still prove helpful in assisting a jury to determine whether or not the paint and paint mixing equipment failed to produce paint that matched the sample colors. An ordinary consumer with reasonable expectations would expect the paint and paint mixing equipment to match the paint samples. See O'Neil v. Electrolux Home Products, Inc., 2008 WL 2066948, at *5 (D.Mass. May 14, 2008). Furthermore, a juror, based on his or her common knowledge, can decide whether the mixed paint matched the sample indicators. The frequency of the failure and, in turn, the existence of a material breach of the implied warranty of merchantability likewise presents a genuine issue of material fact for the jury.

26

See Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006); Dialogo, LLC v. Bauza, 456 F.Supp.2d 219, 225 (D.Mass. 2006); see also DiPietro v. Sipex Corp., 865 N.E.2d 1190, 1197 (Mass.App.Ct. May 14, 2007).  Summary judgment on the breach of contract claim against Sublime is therefore inappropriate.

As previously noted, plaintiff also argues that the contract fulfillment consideration should be returned immediately even if a dispute of material fact regarding the breach of contract claim remains.  "In Massachusetts, as elsewhere, contracts are construed by the judge unless extrinsic evidence is offered to resolve supposed ambiguity . . . in the latter event, the dispute may go to a jury so that it can resolve the underlying factual issues."  Great Clips, Inc. v. Hair Cuttery of Greater Boston, L.L.C., 591 F.3d 32, 35 (1st Cir. 2010).  "The interpretation of an unambiguous contract is a matter of law for the court . . . So, too, is the determination as to whether a contract contains an ambiguity."  Nolan v. CN8, 656 F.3d 71, 81 (1st Cir. 2011) (Selya, J. concurring) (citations omitted).  "To be ambiguous, the language, fairly read, must be 'susceptible of more than one meaning.'"  Id. at 82 (Selya, C.J. concurring) (quoting Lumbermens Mut. Cas. Co. v. Offices Unltd., Inc., 645 N.E.2d 1165, 1168 (Mass. 1995)).

Here, the contract language is unambiguous.  The relevant language dictates that, should the requirements agreement "terminate for any reason" before the "Contract Term," i.e. five years (Docket Entry # 19-3, ¶ 1), then, "in addition to whatever rights and obligations the parties may have," Sublime "shall refund" the applicable percentage of the contract fulfillment consideration payment.  (Docket Entry # 19-3, ¶ 4).  Thus, irrespective of the "rights" created by the material breach, if any, the contract requires that Sublime "shall refund" the percentage of the contract fulfillment consideration where, as here, the requirements agreement "terminate[s] for any reason." (Docket Entry 19-3, ¶ 4).  The presence of the integration clause confirms the lack of ambiguity to the foregoing mandatory language.  <u>Artuso v. Vertex Pharmaceuticals, Inc.</u>, 637 F.3d 1, 6 (1st Cir. 2011) (where no ambiguity exists, terms of an employment agreement must be "deduced, construed, and enforced as written.  This is particularly true where, as here, the contract contains an integration clause").

In any event, defendants do not argue that Sublime should be excused specifically from returning the amount as a result of plaintiff's breach of the implied warranty of merchantability. When asked whether he planned to return the amount, however, Miller answered, "No.  Absolutely not.  I feel that I owe them nothing."  (Docket Entry # 19-2).

In sum, in light of the unequivocal, unambiguous language, Sublime is required to return the contract consideration payment. Plaintiff, however, fails to establish the amount of the contract fulfillment consideration payment as a matter of law.  In its memorandum in support of summary judgment, plaintiff initially identifies the amount of the contract fulfillment consideration as $33,000, presumably applying the 110% percentage for contract year one.  The memorandum also states that, "even to the extent that this Court determined that there was a material dispute of fact regarding the parties' dispute, the $30,000 should be returned immediately."  (Docket Entry # 19).  Plaintiff does not identify the amount of minimum purchases made by defendants and provides two conflicting dates upon which it suggests that Miller and Sublime breached the contract, May 24, 2008 and June 25, 2008.  In addition, plaintiff does not clearly identify the contract year in which the breach occurred.  The amount to be returned therefore remains a genuine issue of material fact to be determined at trial.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion to strike (Docket Entry # 23) is **ALLOWED** and its motion for summary judgment (Docket Entry # 19) is **DENIED** except to the extent that Sublime is required to return the percentage of the contract fulfillment consideration with the amount of the payment to be

determined at trial.  Discovery is complete and the deadline for dispositive motions has passed.  This court will conduct a status conference on August 8, 2012 to set a trial date.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge